IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED FOOD AND COMMERCIAL     :
WORKERS UNIONS AND
PARTICIPATING EMPLOYERS PENSION :
FUND AND ITS TRUSTEES
                               :
    v.                              Civil Action No. DKC 22-0295
                               :
SUPERVALU INC., et al.,
                               :

**MEMORANDUM OPINION**

Pending and ready for resolution in this case brought pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, is the motion for summary judgment by Defendants SuperValu, Inc., Shoppers Food and Pharmacy, and Shoppers Food Warehouse Corp., (ECF No. 25), and the cross-motion for summary judgment by Plaintiffs United Food and Commercial Workers Unions and Participating Employers Pension Fund and its Trustees (collectively the "Fund"), (ECF No. 26).  The issues have been briefed, and the court now rules, no hearing being necessary.  Local Rule 105.6.  Because Defendants' 2017 collective bargaining agreements expired in July 2020, Defendants' motion for summary judgment will be denied, and Plaintiffs' cross-motion for summary judgment as to liability will be granted.

**I.   Background**

An overview of the relevant ERISA provisions will assist in understanding the issues presented by the pending motions.

**A. Statutory Background**

ERISA "was designed to ensure that employees . . . would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986) (internal quotations omitted). One type of pension plan regulated by ERISA is a "multiemployer pension plan," in which "multiple employers pool contributions into a single fund" that pays benefits to retirees that worked for one or more of the contributing employers. *Trustees of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2ᵈ Cir. 2012). These plans allow employees to "receive benefits that follow them throughout jobs within a particular industry," and permit employers "to offer those benefits while taking advantage of cost- and risk-sharing mechanisms." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 929 F.3d 135, 138 (4ᵗʰ Cir. 2019).

But market factors often prompt employers and unions to act in ways that endanger the long-term solvency of multiemployer plans. For instance, "if one participating employer fails to . . . contribut[e] to the plan—whether because their [collective bargaining agreement] has expired, they have gone out of business, or otherwise—the remaining employers must then make larger contributions or employees must receive reduced benefits to cover

the shortfall." *Id.*   These "rising costs" then "encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base." *Id.* (quotation marks omitted).  A "vicious downward spiral" ensues: The plan continues to pay benefits in the short-term while dwindling contributions render it insolvent in the long-term, and eventually "it is no longer reasonable or possible for the pension plan to continue." *Id.* (quotation marks omitted); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151 (7ᵗʰ Cir. 1989) (en banc) ("Multi-employer plans are defined-contribution in, defined-benefit out.  Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize[.]").

To address these problems, Congress has twice amended ERISA to empower the sponsors of multiemployer plans to force employers to contribute at the rates necessary to ensure the plans' viability.  First, in 1980, Congress adopted new provisions which "provide[d] a separate federal cause of action" allowing plan sponsors to sue employers directly and collect contributions owed "under the terms of the plan's governing documents or the CBA." *Four-C-Aire*, 929 F.3d at 139 (citing ERISA § 515, 29 U.S.C. § 1145).  Then, in 2006, Congress again amended ERISA to add new enforcement "mechanisms" which empower plan sponsors to restore

the solvency of the most financially endangered multiemployer plans.  *Honerkamp*, 692 F.3d at 130.

Under the 2006 ERISA amendments, the sponsor of a multiemployer plan can certify that the plan is in "critical status," meaning that it is in serious "danger of being unable to meet [its] pension distribution obligations in the near future." *Id.* at 129 (citing ERISA § 305(b); 29 U.S.C. § 1085(b)).  When a multiemployer plan enters critical status, the plan's sponsors create a "rehabilitation plan," which includes a proposed list of potential "benefit reductions" and "revised contribution" schedules.  29 U.S.C. § 1085(e)(1)(B).  ERISA states that these rehabilitation plans "must be adopted."  29 U.S.C. § 1085(e).  To carry out that mandate, the statute provides two paths toward the imposition of the sponsor's proposed increased contribution schedules.  First, the "bargaining parties"—that is, the employer and the union—can *voluntarily* adopt one of the sponsor-approved contribution schedules once their existing CBA "expires."  29 U.S.C. § 1085(e)(3)(C)(i)-(ii).  If the bargaining parties choose to adopt one of those schedules in their next CBA, then it "remain[s] in effect for the duration of that collective bargaining agreement."  29 U.S.C. § 1085(e)(3)(B)(iii).  Second, if the bargaining parties "fail to adopt" a sponsor-approved contribution schedule within 180 days after their CBA "expires," the sponsor can unilaterally impose its chosen schedule on the bargaining

4

parties.  29 U.S.C. § 1085(e)(3)(C)(i)-(iii).  And if the employer then refuses to pay the increased contributions, the sponsor can sue the employer to enforce them.  29 U.S.C. § 1085(e)(3)(C)(i)-(iii).

As long as the multiemployer plan remains in critical status, the sponsor must regularly update its approved contribution schedules based on annual re-evaluations of the multiemployer plan's financial status.  29 U.S.C. § 1085(e)(3)(B).  And the bargaining parties likewise must continue to adopt an updated sponsor-approved contribution schedule every time they agree to a new CBA.  29 U.S.C. § 1085(e)(3)(C)(ii).  Thus, if a CBA "providing for contributions . . . in accordance with a schedule provided by the plan sponsor . . . expires while the plan is still in critical status," the bargaining parties once again have 180 days voluntarily to adopt an updated sponsor-approved contribution schedule.  29 U.S.C. § 1085(e)(3)(C)(ii)-(iii).  And if they do not, the sponsor may once again unilaterally impose its chosen rates.  29 U.S.C. § 1085(e)(3)(C)(ii)-(iii).

### B.  Factual and Procedural Background

In 2017, Defendant SuperValu, Inc., agreed to CBAs with Locals 27 and 400, two United Food and Commercial Workers unions.  Each CBA stated that it was "effective" on July 9, 2017, and that it would "expir[e]" on July 11, 2020.  (ECF No. 25-2, at 8, 80).  SuperValu belongs to a multiemployer plan called the United Food

5

and Commercial Workers Unions and Participating Employers Pension
Fund (the "Fund").

The Fund was certified to be in critical status in 2010 and
it remains in critical status today. (ECF No. 26-2, at 206-215).
Thus, over the last decade, the Fund has periodically evaluated
its financial projections and created several updated
rehabilitation plans calibrated towards regaining fiscal
stability. (*See, e.g.*, ECF No. 26-2, at 217-249) (rehabilitation
plans for 2010, 2016, and 2020). Each of these plans contains
Fund-approved contribution schedules. Reflecting the Fund's
increasingly grim financial outlook, each new rehabilitation plan
has called for higher contribution rates than its predecessor.
(ECF No. 26-2, at 222-231, 240, 247). The 2017 CBAs adopted a
Fund-approved contribution schedule that fit the Rehabilitation
Plan in effect at the time. That schedule called for slightly
increasing contributions year-over-year: From $1.25 in 2017, to
$1.35 in 2018, to $1.45 in 2019. (ECF No. 25-2, at 40, 119).

One day before the 2017 CBAs were set to expire, SuperValu
and the unions signed a document titled "Extension Agreement."
(ECF No. 25-2, at 158). This document stated in part:

> The Parties agree that the current collective bargaining
> agreements between the Parties shall be extended for a
> period of one hundred and twenty (120) days, and shall
> remain in full force and effect through November 8, 2020,
> and day to day thereafter unless the Party wishing to
> terminate the extension gives written notice to the
> other Parties . . . to allow the parties time to continue

> negotiations over proposed amendments to the current
> collective bargaining agreement and to ratify a
> successor collective bargaining agreement.

After signing that agreement, Defendants continued to contribute
to the Fund at a rate of $1.45—the 2019 rate specified in the 2017
CBAs.  (ECF No. 26-2, at 4).

In March of this year, after the complaint was filed, the
bargaining parties made a series of contracts altering their labor
relationship in several ways.  First, on March 2, SuperValu signed
new bargaining agreements with Locals 27 and 400.  Each was titled
in part, "Memorandum of Agreement . . . For A Collective Bargaining
Agreement Retroactive July 12, 2020 to July 10, 2021."  (ECF No.
25-2, at 160, 163).  These new agreements purported to "modify"
certain terms from the 2017 CBAs and also added several new terms
that were not in the 2017 CBAs at all.  (ECF No. 25-2, at 160,
163).  For instance, Local 27's retroactive bargaining agreement
raised employee wages by $0.40 per hour and modified the kinds of
employee conduct that could give rise to discipline.  (ECF No. 25-
2, at 160).  Meanwhile, Local 400's retroactive bargaining
agreement implemented the same wage increase and added
restrictions to the employee leave policy.  (ECF No. 25-2, at 163).
Each of these retroactive agreements also purported to "amend[]"
the 2020 Extension Agreement so that it "remain[s] in full force
and effect through July 9, 2022, and day to day thereafter" unless

a bargaining party gives written notice.  (ECF No. 25-2, at 160, 163).

Finally, several weeks after signing these new agreements, the bargaining parties signed an "Amended Extension Agreement." (ECF No. 25-2, at 167).  That agreement stated in part:

> All terms and conditions of the Parties' collective bargaining agreement . . . dated July 12, 2020 to July 10, 2021 are extended and shall continue in full force and effect through midnight on July 9, 2022, and day to day thereafter unless the Party wishing to terminate the extension gives written notice to the other Party of at least fourteen (14) days (the 'Extension Period'), to allow the Parties time to continue negotiations over proposed amendments to the Contract and to ratify a successor collective bargaining agreement.

After signing the new agreements and the amended extension agreement, the bargaining parties implemented the changes specified in the new agreements, and SuperValu has continued to contribute to the Fund at the 2019 rate specified in the 2017 CBAs. (ECF No. 26-2, at 4).

In February 2022, prior to the events recounted in the preceding two paragraphs, the Fund and its Trustees sued SuperValu and the two divisions of SuperValu that signed the CBAs with Locals 27 and 400: Shoppers Food and Pharmacy, and Shoppers Food Warehouse Corporation.  (ECF No. 1).[1]  In the four count complaint, the Fund

---

[1] Plaintiffs have not sought to file a supplement to the complaint as permitted under Fed.R.Civ.P. 15(d) to set out a transaction, occurrence, or event that happened after the date of the initial complaint.  Defendants' answer was filed after the events in March and did refer to those events.  The parties'

alleged that Defendants owe delinquent contributions under ERISA §§ 515, 305(e)(3)(C)(iv), and 502(g), and under the Fund's Delinquency Policy and Trust Agreement, and requested (1) $239,113.35 in alleged delinquent contributions, (2) $12,553.45 in interest, (3) 47,822.67 in liquidated damages, (4) attorneys' fees, (5) "[a]dditional contributions, interest and liquidated damages that may become due and owing during the pendency of this action," and (6) an order to "[r]estrain and enjoin Defendants and all persons acting on Defendants' behalf from failing or refusing to pay to the Fund all amounts, including contributions, interest, liquidated damages, and attorneys' fees and costs which Defendants are obligated to."   (ECF No. 1 at 7-11).   Defendants filed an answer which raised eight defenses. (ECF No. 16).  The Defendants' primary defense to liability was its assertion that its 2017 CBAs never "expired" under ERISA, and thus its statutory obligation to adopt the Fund's updated contribution schedules was never triggered.  (ECF No. 16, at 18-19).  Most of the other defenses addressed the Fund's requested remedies.  (ECF No. 16, at 19-20).

After the Fund and Defendants conferred about discovery, they submitted a joint status report in which they explained that "the Third Defense raised in Defendants' Answer"—that is, the assertion that the 2017 CBAs never expired—would likely be "dispositive" to

---

motions rely on the March events.  Thus, even without formal pleading, the March events are part of this action.

the case's "legal issues," except for "claims and defenses pertaining to damages." (ECF No. 20). The Fund and Defendants thus jointly asked the court to enter a schedule for "pre-discovery summary judgment briefing" about the expiration issue, and to stay all other matters. (ECF No. 20). The court granted that request. (ECF No. 21). Defendants filed a motion for summary judgment (ECF No. 25), the Fund cross moved for summary judgment as to liability, (ECF No. 26), Defendants responded, (ECF No. 29), and the Fund replied, (ECF No. 30).

## II.  Standard of Review

A court will grant a motion for summary judgment when there is no genuine dispute of a material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4ᵗʰ Cir. 2003) (internal citation and quotations omitted).  In doing so, it must "take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Id.* (internal citation and quotations omitted).

## III. Analysis

The cross-motions for summary judgment turn on whether—and when—the 2017 CBAs "expired."  The Fund argues that those CBAs expired in July 2020, triggering the obligation to adopt one of the Fund's updated 2020 contribution schedules.  And, the Fund asserts that, because more than 180 days have passed since the expiration, it has the power to impose unilaterally its chosen schedule on Defendants.  On the other hand, Defendants argue that the 2017 CBAs have actually never "expired"—rather, the bargaining parties agreed to extend them indefinitely.  Thus, Defendants argue that their obligation to adopt the Fund's updated contribution schedules has not yet been triggered.

Section 305(e)(3)(C)(iv) of ERISA, 29 U.S.C. § 1085(e)(3)(C)(iv), applies to Funds in critical status and provides that "[a}ny failure to make a contribution under a

11

schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." According to the Fund, as applicable here, once the 2017 collective bargaining agreements expired, and the bargaining parties failed to adopt a contribution schedule from those proposed, the Fund was entitled to implement its default schedule 180 days after the date the CBA expired. It calculates that date to be in January 2021.

The relevant portions of ERISA depend on the terms "duration" and "expiration" of a collective bargaining agreement. While the statute does not define those terms, they are readily understood, well known, and used in labor law, and cases apply them without resorting to complicated definitions. *See, e.g.*, *Pittsburgh Mailers Union Local 22, et al. v. PG Publishing Co., Inc.*, 30 F.4th 184 (3d Cir. 2022). "Duration" is "[t]he length of time something lasts." *Duration*, Black's Law Dictionary (11th ed. 2019). Something "expires" when it is "no longer legally effective." *Expire*, Black's Law Dictionary (11th ed. 2019). And an "expiration date" is "the date after which something . . . is no longer in effect." *Expiration Date*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/expiration%20date (last accessed December 28, 2022).

Courts must "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary

principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M & G Polymers USA v. Tackett*, 135 S.Ct. 926, 933 (2015) (quoting *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448 (1957)).   Thus, "the [bargaining] parties' intentions control."   *Id.* (internal quotations omitted).  "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

Here, the "[e]xpiration date" designated in the 2017 CBAs is July 11, 2020.  (ECF No. 25-2, at 8, 80).  Each 2017 CBA also has a "Duration Clause."  (ECF No. 25-2, at 45, 125); *see Tackett*, 135 S.Ct. at 934 (a "durational clause" provides a "set time" at which a CBA "expire[s]").  The Duration Clause in Local 400's 2017 CBA states:

> This Agreement shall continue in effect from July 9, 2017, to July 11, 2020, and shall continue in effect from year to year thereafter unless either party serves notice in writing on or before, February 1, 2020 . . . of a desire for termination of or for changes in the Agreement.  In the event either party serves such notice in respect to changes in the Agreement, the Employer and the Union shall immediately begin negotiations on the proposed changes, and that pending the termination of negotiations, neither party shall change conditions existing under the Agreement, it being understood and agreed that either party may in its own discretion, by written notice, unilaterally terminate such negotiations whenever it so desires.

(ECF No. 25-2, at 45).  The Duration Clause in Local 27's 2017 CBA
is similar:

> This Agreement shall be effective from July 9, 2017 and
> shall remain in force until and including July 11, 2020,
> and from year to year thereafter, with the right of
> either party to reopen upon written notice, not less
> than sixty (60) days prior to July 11, 2020, or the first
> (1ˢᵗ) day of June of any subsequent year thereafter of a
> desire either to change or terminate this Agreement.  In
> the event either party serves notice, it is agreed that
> the Employer and the Union shall immediately begin
> negotiations on the proposed changes and that, pending
> the results of such renegotiation, neither party shall
> change the conditions existing at the time under the
> Contract.

(ECF No. 25-2, at 125).

Meanwhile, the new bargaining agreements that Defendants
signed with the Unions earlier this year each "retroactive[ly]"
set the terms of the bargaining parties' labor relationship for
the "time period from July 12, 2020 to July 10, 2021."  (ECF No.
25-2, at 160, 163).  The bargaining parties agreed to continue
bargaining "with the goal of entering into a three-year collective
bargaining agreement which terms shall be July 11, 2021, through
July 13, 2024."  (ECF 25-2, at 161, 165).

The Fund is correct that the 2017 CBAs expired in July 2020—
on the original expiration date included within those CBAs and
when the new bargaining agreements retroactively took effect.  The
bargaining agreements signed earlier this year "retroactive[ly]"
began on July 12, 2020, (ECF No. 25-2, at 160, 163)—the day after
the original "[e]xpiration" date designated in the 2017 CBAs.  (ECF

14

No. 25-2, at 45, 125).   While these bargaining agreements were signed in March of this year, "a union and an employer can contract to cover matters that occurred at earlier points in time" by "agree[ing] to 'backdate' the effective date of a newly created CBA." *Giles v. Univ. of Toledo*, 286 F. App'x 295, 302 (6th Cir. 2008) (citing *Mail-Well Envelope, Cleveland Div. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 54*, 916 F.2d 344, 346-47 (6th Cir. 1990)).   Thus, Defendants backdated their new agreements to match the expiration of their old CBAs.   And once those new bargaining agreements became effective, the 2017 CBAs could not be—thus, they expired.   *See Expire*, Black's Law Dictionary (11th ed. 2019) (something "expires" when it is "no longer legally effective").

Although the new agreements carried forward many of the terms of the 2017 CBAs, they amended some, deleted others, and added still others.   For instance, the new agreements instituted pay increases, changed employee discipline rules, and modified the company's leave policy.   (ECF No. 25-2, at 160-165).   And a contract that purports to be a "new CBA" does not "merge[] into" an old CBA simply because it "carrie[s] the terms of the expired CBA forward." *Michels Corp. v. Cent. States, Se., and Sw. Areas Pension Fund*, 800 F.3d 411, 420-21 (7th Cir. 2015).   Rather, the carried-forward terms live on in the "new contract," while the old CBA remains expired.   *Id.* at 419-421.   Thus, because the bargaining

15

agreements signed earlier this year retroactively became "the governing CBA[s]" in July 2020, the 2017 CBAs have "long since expired." *Id.* at 419.

Defendants argue that the retroactive agreements they signed earlier this year were not new bargaining agreements, but rather contracts to "continue[] [the] operation" of the 2017 CBAs past their original expiration date. (ECF No. 29-1, at 7). But the agreements themselves say otherwise; the title of each document reads in part, "*Collective Bargaining Agreement* Retroactive July 12, 2020 to July 10, 2021." (ECF No. 25-2, at 160, 163 (emphasis added)).

Other contracts between Defendants and the Unions reflect the same understanding—that the agreements signed earlier this year were new bargaining agreements, not extensions of the old CBAs. For instance, a few months ago, the bargaining parties signed another contract to extend the terms of the new bargaining agreements into 2022. (ECF No. 25-2, at 167). That contract describes the new bargaining agreements not as extension agreements, but as "the Parties' *collective bargaining agreement[s]* . . . dated July 12, 2020 to July 10, 2021." (ECF No. 25-2, at 167 (emphasis added)). And because these new agreements retroactively became effective in July 2020, the 2017 CBAs expired no later.

What is more, if Defendants and the Unions really sought to "continue" the operation of the 2017 CBAs, then those CBAs provided a method for doing so: Under the Duration Clauses, the 2017 CBAs would continue "year to year" after July 11, 2020, absent timely written notice from either bargaining party of the desire either to change or terminate the agreement.  (ECF No. 25-2, at 45, 125). The CBA then provided: "In the event either party serves notice, it is agreed that the Employer and the Union shall immediately begin negotiations on the proposed changes and that, pending the results of such renegotiation, neither party shall change the conditions existing at the time under the Contract."  There was no notice of termination.  Rather, the bargaining parties agreed to negotiate over amendments and eventually signed agreements with new provisions which governed for a new time period, thus manifesting a clear intent to move on from the 2017 CBAs.  It is true that the new one-year agreements did not have all the trappings of a CBA, but that is not dispositive:

> The Fund pushes back with the assertion that its position—that the November 15, 2011 agreement was not a new CBA—squares better with the mechanics of collective bargaining agreements. Labor law requires that for a new collective bargaining agreement to be created, it must be approved by a vote of the membership of the union. See *Booster Lodge No. 405, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. NLRB,* 412 U.S. 84, 86 (1973). The Teamsters Constitution is no exception: it states that a new CBA is "ratified by majority vote of the Local Unions having and exercising jurisdiction over the work covered by the agreement," and it is not binding until after that vote. The Union membership did not vote

on any of the one-month extensions to the 2006 CBA. They
voted on nothing until the new CBA was presented to them
in June 2012. This argument, however, proves too much.
It is common in labor relations for one collective
bargaining agreement to expire before a new full-blown
agreement can be concluded. The parties must, and do,
continue to bargain during that interim period, and they
often agree to carry forward the terms of the old CBA
(perhaps with some modifications) if the bargaining is
still fruitful and impasse has not been reached.

*Michels*, 800 F.3d at 420.

Seeking to evade this conclusion, Defendants rely heavily on
a different contract signed by the bargaining parties—an
"Extension Agreement" signed on July 10, 2020, the day before the
2017 CBAs were set to expire.  (ECF No. 25-2, at 158).  This 2020
Extension Agreement states that the 2017 CBAs "shall . . . remain
in full force and effect through November 8, 2020, and day to day
thereafter unless the Party wishing to terminate the extension
gives written notice."  (ECF No. 25-2, at 158).  Thus, because
neither party has given a termination notice, Defendants argue
that the 2017 CBAs now remain in effect "indefinitely."  (ECF No.
25-1, at 8, 11).

But that argument overlooks both the wording of the 2017 CBAs
themselves and the fact that the bargaining parties recently
amended the 2020 Extension Agreement.  That amendment clarifies
that it is the bargaining agreements signed earlier this year—not
the 2017 CBAs—that currently govern the labor relationship.
Indeed, a few weeks after signing the new bargaining agreements,

Defendants and the Unions signed an "Amended Extension Agreement." (ECF No. 25-2, at 167). While the 2020 Extension Agreement purported to extend the 2017 CBAs, this new *amended* version instead applies the extension to the "collective bargaining agreement[s] . . . dated July 12, 2020 to July 10, 2021"—that is, the new bargaining agreements signed earlier this year. (ECF No. 25-2, at 167). While the bargaining parties may have earlier agreed to extend the 2017 CBAs indefinitely, they have since amended that extension agreement so that it applies to the new bargaining agreements instead. Thus, the bargaining parties explicitly reinstated the original July 2020 expiration date of the 2017 CBAs.[2]

---

[2] In a case involving a similar series of extension agreements and retroactive CBAs, the United States District Court for the District of Minnesota reached the same conclusion the court reaches here. *See Allied Sales Drivers & Warehousemen, Local No. 289 v. Sara Lee Bakery Group*, No. 10-4975 (MJD/LIB), 2012 WL 4470466 (D.Minn. Sep. 26, 2012). In *Sara Lee*, the CBA between an employer and a union was set to expire on October 9, 2010. *Id.* at *6. Just before that expiration date, the parties agreed to extend that CBA until December 31, 2010, so that its terms would remain in place during negotiations. *Id.* at *3. Eventually, the parties agreed to a new CBA, which retroactively took effect on October 10, 2010—the day after the prior CBA was originally set to expire. *Id.* at *6. The court held that the creation of the new retroactive CBA effectively reinstated the old CBA's prior expiration date. *Id.* Indeed, "[a]s of October 10, 2010 a new collective bargaining agreement . . . was in effect and the prior CBA was not in effect." *Id.* Thus, despite the initial extension beyond the original October 9 expiration date, "[t]he original CBA's term had to have ended on October 9" because "the new collective bargaining agreement[] . . . beg[a]n on October 10." *Id.; see also Allied Sales Drivers & Warehousemen, Local No. 289 v. Sara Lee Bakery Group*, 746 F.3d 342, 346 (8th Cir. 2014)(affirming on other grounds,

Even if Defendants and the Unions originally agreed to extend the terms of their 2017 CBAs pending ongoing negotiations concerning amendments, when those negotiations bore fruit, the bargaining parties retroactively reinstated the expiration date of the 2017 CBAs and had their new bargaining agreements start the next day.  As noted above, that practice is standard in labor relations.  While the employer and union continue to bargain during an interim period, they often agree to carry forward the terms of the old CBA for a short time until the negotiations yield a new bargaining agreement.  *See Michels*, 800 F.3d at 420.  That is what happened here.[3]  The bargaining parties recognized that the 2017

_____

but reasoning that "though the extension agreement purported to 'extend' th[e] [prior] CBA to December 31, 2010, the potential overlap created by the new CBA's October 10, 2010, start date seems to prevent the old CBA's term from having ended any later than its original October 9, 2010, date"); *cf. id.* at 349-50 (Colloton, J., concurring)(reasoning that "the extension did not replace the original term of the CBA," but rather created an "extension period" which began "after the original CBA expired" because the bargaining parties did not explicitly "amend" the original CBA's duration clause, "and the Extension Agreement does not provide that it supersedes the CBA itself").

[3] Defendants also note that the bargaining agreements signed earlier this year purported to "amend[]" the 2020 Extension Agreement so that it "remain[s] in full force and effect through July 9, 2022, and day to day thereafter" unless a party gives written notice.  (ECF No. 25-2, at 160, 163).  Defendants argue that this language shows that the new bargaining agreements "recognized the continued viability" of the 2020 Extension Agreement, and thus that the 2017 CBAs remain in effect.  (ECF No. 25-1, at 11).  But as explained above, a few weeks after signing the new bargaining agreements containing that language about the 2020 Extension Agreement, the bargaining parties agreed to amend the extension agreement itself to clarify that the extension

CBAs expired in July 2020, that amendments were desired, but that COVID would delay negotiations.  (ECF No. 25-2, at 158).  Rather than negotiate for a full three-year CBA, they eventually reached a one-year bargaining agreement which governs their labor relationship while they continue to negotiate over the three-year CBA.  (ECF No. 25-2, at 160-165).  Throughout, however, the expiration of the 2017 CBAs was constant.

By contrast, Defendants' reading of their contracts makes little sense.  They seem to argue that the bargaining parties agreed to extend their 2017 CBAs even *after* they agreed to terms on—and retroactively imposed—the new bargaining agreements.  By that logic, Defendants and the Unions simultaneously created new bargaining agreements meant to govern the "time period [beginning] July 12, 2020," (ECF No. 25-2, at 160, 163), and *also* chose to extend the 2017 CBAs into that same time period.  That would mean that the bargaining parties sought to have their labor relationship governed by two separate—and conflicting—bargaining agreements at the same time.  That outcome not only appears legally impossible, *see Michels Corp.*, 800 F.3d at 419 (only one agreement can "qualify

---

applies to the new bargaining agreements, not the 2017 CBAs.  Thus, even if Defendants' chosen language means that the 2020 Extension Agreement has "continued viability," that extension agreement itself has been amended so that it no longer applies to the old 2017 CBAs.  Either way, the 2017 CBAs have expired.

as the governing CBA"), but neither Defendants nor the Unions would likely have intended such an odd result.

What is more, reading the 2020 Extension Agreement to extend the 2017 CBAs indefinitely would impermissibly "undermine the statutory protections Congress set in place for multiemployer pension plans." *Four-C-Aire, Inc.*, 929 F.3d at 151.  "Because multiemployer plans typically involve many employers and unions across the nation," it is "difficult and costly for such plans to monitor the problems or understandings that arise between the individual unions and employers." *Bakery and Confectionary Union and Indus. Intern. Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997).  To address that challenge, Congress amended ERISA to allow multiemployer plans to enforce contribution requirements "uniformly" against multiple employers, "despite the existence of numerous individual CBAs—all with their own unique provisions—through which employers agreed to contribute." *Four-C-Aire*, 929 F.3d at 139, 140, 151.  Thus, courts must interpret CBAs "in accordance with [Congress's plan-empowering] purpose," and cannot adopt a "unique" interpretation that "prevent[s] [the plan] from uniformly enforcing . . . contribution requirements." *Id.* at 141, 151.

Defendants' indefinite extension theory is precisely such a disfavored interpretation.  If SuperValu could indefinitely extend its CBAs so that they never "expire," then it could forever avoid

complying with the contribution rates the Fund seeks to impose uniformly on all participating employers.   And "other . . . employers" could craft "similar individual CBA terms to limit their particular obligations to the Fund." *Id.* at 151.  Such an outcome cannot be squared with ERISA's mandate that "[r]ehabilitation plans must be adopted for multiemployer plans in critical status." 29 U.S.C. § 1085(e).  Indeed, if this indefinite-extension loophole were allowed, multiemployer plans would have little hope of uniformly collecting adequate contributions—"a result [ERISA] was designed to avoid." *Id.*

To support its argument that the 2017 CBAs have not yet expired, Defendants rely heavily on three federal cases: One from this court, *see Bakery and Confectionary Union and Indus. Int'l Pension Fund v. Just Born II, Inc.*, No. DKC 16-0793, 2017 WL 511911 (D.Md. 2017), *aff'd*, 888 F.3d 696 (4th Cir. 2018), and two from district courts in other circuits, *see Central States, Se. and Sw. Areas Pension Fund v. Wingra Redi-Mix, Inc.* (*Wingra*), No. 12-cv-04084, 2016 WL 1555579 (N.D.Ill. 2016), and *Lattin v. Kurdziel Iron of Rothbury*, No. 95-cv-890, 1996 WL 33657103 (W.D.Mich. 1996). None of these cases involved a dispute about the proper expiration date of a CBA—rather, in each one, all parties to the litigation agreed that the CBA at issue *had* expired, and the suit hinged on legal issues arising after the expiration.

To start, in *Just Born II*, an employer and a union agreed to extend their expiring CBA by two months from February 28, 2015, to April 30, 2015.  2017 WL 511911, at *2.  Noting that this court's order in that case purportedly listed the latter date as the CBA's expiration date, Defendants argue that this court "has specifically recognized" that ERISA's 180-day countdown begins when an extension agreement expires, rather than on a CBA's original expiration date.  (ECF No. 25-1, at 12).  That argument reads too much from too little.  In that case, the CBA's expiration date was neither disputed nor germane to the legal issues raised.  And more importantly, the bargaining parties in *Just Born II* did not later agree to a new bargaining agreement which retroactively took effect the day after the old CBA was originally set to expire.  Thus, even if this court had held that the CBA in that case "expired" two months later than it otherwise would have, that holding would not apply here because—unlike the employer in *Just Born II*—Defendants here signed new bargaining agreements that retroactively reinstated their old CBAs' original expiration date.

Defendants' out-of-circuit cases do not apply here either. In *Wingra*, the parties "conceded" that the CBA *had* expired, and the only question was whether the employer's contribution obligations survived past that expiration.  2016 WL 1555579, at *5.  The court's answer to that question rested on a specific contract the employer there signed, and it is irrelevant here.

*Id.* Meanwhile, *Lattin* involved an employee who sued under a CBA that all agreed had expired before the suit was filed. 1996 WL 33657103, at *1-4. The case does not address whether parties to a multiemployer plan in critical status can indefinitely extend their CBA. Indeed, the case was decided nearly a decade before Congress amended ERISA to add the critical status funding provisions at issue in this case.[4]

## IV. Conclusion

Because the 2017 CBAs expired in July 2020, and more than 180 days have passed without the adoption by the bargaining parties of one of the proposed schedules, the Fund is entitled to impose the chosen schedule and sue for delinquent contributions. Accordingly, the Fund's cross-motion for summary judgment on

---

[4] The Fund's cross-motion for summary judgment also raises an "alternative" argument for why Defendants owe delinquent contributions under ERISA. (ECF No. 26-1, at 22-23). The Fund notes that, just like ERISA, the Fund's rehabilitation plan requires Defendants to adopt the Fund's proposed contribution schedules within 180 days after a CBA "expires." (ECF No. 26-2, at 244-49). The Fund also notes that its Trust Agreement with Defendants grants the Fund "the exclusive power to interpret, apply, [and] construe" documents that are "related" to the parties' pension plan, which the Fund argues includes the rehabilitation plan documents. (ECF No. 26-1, at 23). Thus, even if the 2017 CBAs did not "expire" under ERISA's critical status funding provisions, the Fund argues that it has the discretion to decide that the 2017 CBAs *did* "expire" under the rehabilitation plan. And because another provision of ERISA requires Defendants to make all contributions required by the Rehabilitation Plan, *see* 29 U.S.C. § 1145, the Fund argues that Defendants owe delinquent contributions under ERISA all the same. Because the 2017 CBAs expired under ERISA's critical status funding provisions, the court need not reach this alternative theory.

liability will be granted and Defendants' motion for summary judgment will be denied.  A further schedule will be put in place in consultation with counsel.

                                                          /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge